Thank you, your honor. It may please the court, my name is Michael Kahn and I represent the three plaintiffs who are the appellants here. As the court knows, this case involves the plaintiff's claim that a melody that plays throughout nearly half of defendant's song, Dark Horse, infringes their copyright in the repeating melody in their song, Joyful Noise. My clients call that melody the beat, defendant Katie Perry calls it the chorus, the musicologists that we'll be discussing call it the ostinato. And regardless of the label, the question on appeal is, should this court uphold the unanimous verdict of a properly instructed jury on the issue of extrinsic similarity between these two melodies? Let me just ask you this. My reading of Judge Snyder's ruling on the JMOL was that she did in fact basically allow the jury to decide the facts, but as a matter of law, she concluded that the extrinsic test, which is essential, was not satisfied. What is your best argument that Judge Snyder was wrong and that the extrinsic test was satisfied? Your Honor, excellent question. In fact, answering that question I think presents this court with a significant obstacle in trying to evaluate that evidence. As the court can confirm from the transcripts, both musicologists relied heavily upon the ears of the jurors. They both agreed and understood the essential role that the jurors' ears played. As you look at the transcript, you'll see Professor Decker saying to the jury throughout his testimony to make his point, and on the issue of tempo, he even clapped to the beat. Dr. Ferrara, the defendant's expert, relied even more on the jury's ears. He had an electric piano up on the witness stand, and as the court can confirm in the 92 pages of that transcript, he played the piano 130 times, more than once every page. Thus, in reaching this verdict, which is part of the jury instructions, was a special interrogatory on this factual issue, the jury heard and assessed significant evidence. As your colleague, Judge Aikuda, in her separate opinion in Skidmore at page 186, she wrote that as an appellate body, quote, we are not well situated to determine whether a musical passage is original. Such a determination should have been left up to a properly instructed jury. For whom I have great respect was writing for two judges on an 11-judge panel, so I understand your repeated references to what she said, but that's not precedent. I understand law as to how to deal with judgments, MOL generally, but this is a particular question that courts have identified as being perhaps more susceptible than others for judicial resolution. In your brief, you cite a few cases that make this point, but I didn't see much in the way of cases that fit this context. That is, in this context, the jury finds in favor of plaintiff, but the court concludes on the extrinsic test that the plaintiff's case falls short. You have other cases you can reference to where the court says what you're asking us to say, which is that, well, we're going to defer to the jury on this because they know best. They were properly instructed. I don't see any decision that draws back quite as much as you're asking us to draw back for this particular question, and that's why I invite you to point me to precedent that does. I don't have one. And if you will, please, in answering his question, you know, we've got the intrinsic and extrinsic. Intrinsic, no question. The jury has got the ball, and the judge said so, but Judge Snyder, I know you want to answer Judge Clifton's question. Judge Snyder went through in great detail to explain why, as a matter of extrinsic analysis, it didn't work. So please answer Judge Clifton's question, and then mine kind of flows from that, I think. Okay. I think one way to answer it, I can point to three specific errors that the judge made in reaching her conclusion. The first one was... Well, I shouldn't do that, but my original focus is what is it that makes us bow to the jury's verdict just because it's the jury's verdict? And my thought is that for this particular question, that's not a real deep bow. Courts have intervened at this stage elsewhere, and I'd like to get to the substance of that, but understand that it's in a context where courts not infrequently exercise their authority. My answer, Your Honor, although I don't have a case at hand, is that there are indications, there are statements, there's evidence that's in the record that the jury was presented with, which the district court does not address or incorrectly addressed. One example is her statement, the judge's statement, that a pitch sequence is not entitled to copyright protection. Apparently the judge didn't understand that a pitch sequence is just a technical name for a melody. And as this court has noted more than once, even a short melody of seven notes, original, can be protected here. Dr. Decker testified that he knew of no similar ostinato melody prior to the plaintiff's creation. And the best that Dr. Ferrara could do was point to an isolated six notes at the end of Jolly Old St. Nick, a 19th century Christmas song, and the beginning of Merrily We Roll Along. Neither one of these is an ostinato. They appear only once. Dr. Decker dismissed the alleged similarity. You read the testimony of the experts perhaps differently than I do. But it seemed to me that your expert really backfilled a lot, really qualified his testimony on the issue that what we as lawyers would call the extrinsic test. Admittedly, the jury was clear about the other element, and the judge didn't mess with that. It was based entirely on the extrinsic test. So I guess I'm wrestling with the same issue that Judge Clifton is. It seems to me that the case law says that we as judges are fully authorized and empowered and indeed required to examine the extrinsic test ourselves. We do not defer to the jury on that. It's really a matter of law. Do you disagree with that, and if so, on what basis? I agree that the judges have a special role in examining the extrinsic evidence, but you still have to examine the evidence. Right. And that's the first point, which is the district judge's misunderstanding of pitch sequence. She also made the finding that all these other elements that he identified are merely commonplace and not individually protected, and that's true. But Dr. Decker testified at length how the use of each of these elements was original and distinctive. The best example is he admitted that no composer is entitled to monopolize evenly spaced notes. But he makes the point that its use in joyful noise was original and unusual. As he testified, quote, in popular music in America for the last 150 years, syncopation has been the thing that says American music, and that's lacking here. And he had similar testimony in the other elements. I mean, that's evidence. And there's one other piece of evidence, which is in the transcript, which came actually from the defendant, Katy Perry, who performed Dark Horse during the Super Bowl halftime show in 2015. As the court can confirm, probably already has confirmed, the ostinatoid issue in Dark Horse begins at the 18 second point. And Miss Perry and her team made the decision to perform it in the Super Bowl to cut those 18 seconds out and open with the melody at issue here. And when I asked her to explain under oath that decision, she testified that that ostinato, which she calls the chorus, was, quote, the most identifiable part of the song, close quote. So, I mean, as this court's explained, even a short portion of an entire work, if it's qualitatively important, the finder of fact may find substantial similarity. And here, in Miss Perry's own testimony, she's confirmed that. It's the most identifiable part of the song. So, yes, the musicologist disagreed on many points. And in most of those cases, they either sang or played the piano to support their disagreements. And that's my point here, Your Honor. There is evidence in the trial that the jury considered, assessed, and ruled on, on that specific special interrogatory of extrinsic similarity that simply is not available to this court. Let me be sure I understand. Now, you're saying that there was a special interrogatory given to the jury on the issue of the extrinsic similarity. It's not available to us, but we're bound by it? Is that what you're saying? No. I'm saying that the special interrogatory is available to the court. I'm just saying that there was, at least at that level, I believe, Judge Snyder, following the Ninth Circuit, viewed it as proper to give the jury a special interrogatory on intrinsic similarity and a special interrogatory on extrinsic similarity, both of which were requested by the defendant. The jury was given both of those, analyzed the evidence, and reached the conclusion on both, unanimous, that these similarities did exist. And after that happened, Judge Snyder, after a motion for reconsideration, went back and said, you know, on the extrinsic evidence, she went through and concluded why that, in her judgment, could not be correct. Is it your point that, since the jury was given a special interrogatory on that issue, that we are bound or owe deference to the jury on that issue, as opposed to Judge Snyder's analysis? I think that we are bound by the evidence, and in weighing the evidence, in what portion of the evidence this court is able to amass, in reviewing it, I don't think we're ever bound by the jury. But, you know, there was the decision to allow the jury, after assessing this evidence, which included a lot of stuff that they heard, to make that determination, and they did. And that's the deference that I would argue. What do you mean by decision to allow the jury to decide? I mean, it's not like the judge could have said, jury, you're not going to decide this because I am. I think giving the case to the jury is the common practice. And trial judges are encouraged not to intervene too soon. So, again, I'm not sure that the deference that you appear to insist were required to give to the jury is quite so clear on this particular question. But I'm, again, more interested in the specifics of the argument.  But I can, let me, in that summary, the two musicologists disagreed, and they both made their particular arguments to the jury, mostly singing and playing the piano, or clapping. And I suppose you're right, Judge Clifton. It's ultimately what level of deference do we give to this jury that heard all the evidence based on, and the three points I raised didn't go to what the jury heard in the music, were those three points, number one, Miss Katy Perry's testimony about the distinctive quality of that musical repeating melody, Judge Snyder's determination that a pitch sequence was not protectable under copyright, but, in fact, this court has held that short melodies are, and I think that that was a serious error in her analysis of this evidence. Well, I get your point and generally agree with it, although I don't think she was saying quite what you're attributing to her. I don't think she's saying, for example, that the opening of Beethoven's Fifth couldn't be protected. Something's obviously distinctive. I think she's speaking more generically as to sequences of pitch all by themselves. It all gets wrapped up in the combination of elements, and that's the part I'm most interested in. Your argument, as I understand it, is that the combination here is enough, and defendants are going to argue that the combination was not enough, and that's how the district judge ruled, even though the jury said it was. You're right, Your Honor. All I would point out is that among the various elements that the two musicologists debated, one thing was clear, which was the melody. This repeating melody, which the judge referred to as the pitch sequence, was original, and as Katy Perry testified, it was distinctive and identifiable. That, before we get to the other elements, is an original eight-note, two-bar repeating melody, which under Swirsky and other cases is protectable. Do you have anything to say to the district court's alternative holding, which is that even if this were subject to copyright protection, it was at best entitled to only thin protection, and the two works are not virtually identical? What I can say, Judge Watford, is that she gave the jury the thin copyright instruction with what that entailed, and it's clear that the jury didn't agree. The testimony of Dr. Decker is that this is not a thin copyright. There are several different elements that are original to these two melodies. I will close my mouth. Did you say you want to save the balance of your time? Yes, if I could, Judge. Thank you. All right, so I believe that Ms., did you say Lepra or Lepara? Lepara. Thank you, Your Honor. Lepara. May it please the court. Christine Lepara, Mitchell, Silberberg, and Knupp, on behalf of the defendants other than Jordan Houston and Ms. Perry, we respectfully submit that the district court's decision on our Rule 50 motion should be affirmed on the ground that the plaintiffs had not met their burden to prove the extrinsic component of the substantial similarity analysis or in the alternative for a new trial on liability and damages under Rule 50 as the decision of the verdicts were against the weight of the evidence. Very specifically, and I think to Judge Clifton's point, we have a set of precedent here now in the Ninth Circuit, and it was music to the music industry's ears, the Skidmore decision, which gave us a very, very clear enunciation of how important music building blocks are to music creators, emanating from Campbell and a progeny of cases in this circuit and elsewhere. It is not a second-class citizen. Music is entitled to that same breathing room, and what we have here ultimately, and I'll go through it specifically, is just that. And frankly, there's been a decision, although it's not published, out of the Ninth Circuit, Joanne Song's, where it was made very clear that it's the plaintiff's burden to apply a filtering test with the extrinsic test. And when in that particular case, the plaintiff's experts had not addressed whether there was anything protectable in common between the two works, it didn't filter at all, those reports were excluded, and summary judgment was granted to the defense, stressing how critical and sine qua non this extrinsic filtering test is on the unlawful appropriation prong of copying, which is separate from the first prong of copying, which is access and probative similarities. On the unlawful appropriation prong, you have the two tests, extrinsic and intrinsic. And when it comes to the extrinsic, courts are gatekeepers, because it is the objective similarities that have to be compared first, you have to filter out. Ninth Circuit's very clear in the precedent from Renmeister to Mattel and on, you have to first decide whether there's protectable expression in common, and filter out what's not protectable. And then do a comparison to see whether what remains, if anything, is substantially similar to result with unlawful appropriation as the finding. In this specific case, Judge Snyder did specifically that, and found that the jury had not, with the evidence, I disagree with Mr. Kahn, I think Professor Decker gave numerous admissions which support the finding. Most critically, Judge Snyder went through it methodically, went through first. Let's look at what's in common between the two in respect to the elements. And Dr. Decker identified five or six, appellants claimed there were nine. At the end of the day, they all resulted in certain specific elements that he had admitted were not enough by themselves individually. He professed it to be the combination of them. That it includes specifically an ostinato, which is just a phrase that repeats. He says it's eight notes. Ultimately, he agreed there were only six in common. Four Cs, two Bs. Unevenly spaced rhythms, in a sparse texture, played on a synthesizer. Those individual elements, methodically, Judge Snyder went through with Dr. Decker's admissions and said, those are not protectable elements. We can now say those have to be excluded. Now let's look at the combination. And very clearly went through the Satava test as Skidmore had enunciated and supported. And so let's see this combination of those six notes, which is just a simple C and a B, in an A minor scale, a three and a two, which Dr. Decker said, the three is a minor note. It descends down to a one note. It's a very, an rhythmic phrase, it's very simplistic. Ostinatos are commonplace. She looked at all of this, and then she looked at the prior art. And what's critical in this case is that the ostinato that precedes this ostinato, that the appellant's claim is in common with joyful noise, was exactly the same sequence of pitches, exactly on the same rhythms, exactly in a sparse texture, exactly on a synthesizer. The only difference between, we'll call that ostinato number one, and the one that appellant's claim is infringing, ostinato number two, the only difference is that the C note was repeated three times, and the B note was repeated once. So the originality in question for the combination has been expressed to be something other than that ostinato number one, because clearly they didn't say that was infringing. So if repeating a C note a couple more times than repeating a B note, which Dr. Decker said was relatively simple, is enough to create an original combination, I would respectfully submit under Citava, it is nothing more than trivial at best. And to compound that, the prior art demonstrated that one of the writers of Dark Horse had actually written that 3-2-1 sequence in a sparse texture, with a synthesizer, with evenly spaced notes, in a pre-existing song, Love Me or Hate Me, predating Joyful Noise. The 3-3-3-2-2, that is all that's in common between the two ostinatos, is, yes, found in children's songs, you know, Merrily We Roll Along, etc. Dr. Farrar testified this was something that was basically textbook, demonstrating an A minor scale, basically going down a few of the pitches in an A minor scale. And like in Skidmore, a chromatic scale can't be monopolized, neither can an A minor scale be monopolized. These are not pitches all over the place. This is literally a 3 and a 2 and a 1. And when Judge Snyder evaluated whether, under Citava, this was a combination of sufficiently numerous elements, albeit unprotectable, in a novel arrangement, she concluded it was not, based on this prior art and based on, I believe, quite simply common sense. The C and the B, it doesn't take a genius to ultimately, you know, use those iterations of pitches on a synthesizer. They're the two white keys that are right next to each other. And it's not distinguishable at all from the analysis that was done in Skidmore with respect to those basic elements being put in connection with a combination. And Judd Watford's concurrence went a step further and actually said that, you know, even though the analysis in Skidmore was whether or not the instruction had been properly given, went further and said that that combination did not rise to the level of the Citava combination. And even if it did, it was a thin copyright. And a thin copyright only protects against virtually identical copying. Let me just jump in there because you're right. I was focused more on the thin copyright protection. That's sort of what I'm focused on here. I guess I don't see the harm, but maybe you can speak to this. I don't see the harm to the music industry by allowing somebody to claim copyright protection for this combination, even if it's a relatively simple one. As long as all that's prohibited is pretty much exactly copying that in somebody else's song. And obviously Judge Snyder's first out-of-the-box position is simply there's no protection whatsoever. Maybe Perry could have copied this, whatever you want, this ostinato exactly in her song and everything would have been fine. And I guess I find myself a little bit uncomfortable with that. I'm much more comfortable with the notion that fine, it might have been protectable, but only against virtually identical copying, and this certainly wasn't that. It certainly was not that, and that is ultimately not disputed by Dr. Decker. There are a number of differences between the dark horse ostinato and the joyful noise ostinato as a matter of undisputed fact. So there's no question that ultimately, you know, if this panel agrees that, you know, even if there was some modicum of originality with respect to the combination and the selection arrangement, we submit there is not, based on what I said a minute ago. But even if there were, it's a thin copyright at best. It doesn't have to alter necessarily a substantial similarity standard. But within that standard, there could be broad and thin copyrights. And this thin copyright at best, at best, cannot create unlawful appropriation against a not virtually identical ostinato, which is what dark horse was. Let me ask you this, counsel. Yes, your honor. You made a Rule 50 motion that Schneider agreed. She analyzed why she thought the explicit element was not proven. We now have to analyze this. You have one perspective. Mr. Kahn has a different perspective. As we analyze this, are we entitled to consider elements in the record beyond what Judge Schneider did or are we bound by what she relied upon in making her determination to issue a JMOL? I think what's in the record in terms of the testimony of the music experts is what is to be considered. And at the end of the day, whether they sang the pitches or they described them through scale steps, they ended up agreeing as to what they were. So the sound is not the relevant objective inquiry. What is the objective inquiry for an extrinsic test is what's protectable and what's not. So basically in this case, as long as it's in the record, we would do effectively our own analysis to determine whether or not it was protectable. Is that correct? Yes. And everything that you need is in that record, your honor. Of course, but that record, which is on paper, we don't actually get everything that the jury got. You have the sound recording. It brings me back to the broader question. And maybe this reflects some flip side in my part, but I am concerned about the disregard of the jury's consideration. And indeed, I had a case back when I was practicing where I was arguing to the Ninth Circuit. You had to reinstate the verdict because the district judge shouldn't have taken away from us. I understand that perspective. You say in that case, I got the Ninth Circuit to agree. So let me put it back to you in these terms. Why is it that we are authorized to set aside the jury verdict here, given that they heard what was in the record that you were just to look at, and they literally heard it in a way that it's pretty unlikely that we're going to. We're not going to get the chance to sit for whatever period of time this trial took. And replicate their experience. So why is it we should disregard what the jury came to on this particular set of questions? Your Honor, the answer to that question from my perspective certainly is that it is critical, as the Ninth Circuit has said, to actually do the test, the extrinsic test. When Judge Snyder evaluated all the evidence that's in the record, and that includes she heard everyone singing the pitches, she had to come to the conclusion based on the admissions of their own experts, the talent's own experts, that the individual elements were not protectable. And when the combination was analyzed, what remains, the only thing that was added, that's not in prior art or created by the defendants, is repeating a C note and a B note. That combination cannot really arise to the level of anything beyond a trivial contribution. And then to just basically close the loop and say even if you want to give them that, it's thin. And there's no way that there was any dispute. There's a lot of differences between the ostinato. So it was her job, effectively, to do the task that has been mandated by the circuit. And the extrinsic test is not an easy one. It's not easy in music. Even Swirsky says it's an awkward test, but we must do it. And it's imperative to allow that so that there is not a situation where these building blocks are monopolized. That's the danger here. And I go back to what I said at the beginning of my argument, is plaintiffs here have been, appellants now, have been essentially trying to thwart the exercise in the extrinsic test. They have not employed it. They've not gone out of their way to say these things have to be removed. And it is their burden. So the extrinsic test has sort of devolved, as cases show, to the defendants, to point out, and for the judge as a gatekeeper to try to evaluate with the plaintiffs and the appellants, in this case in particular, challenging that when it is their burden. So the extrinsic test has such a core function that here it was, I believe, Judge Snyder did the absolute right thing, and the job that perhaps the jury wasn't cognizant of how this should work, isn't engaged in the satava test, isn't engaged in what's protectable versus unprotectable in the progeny of the case law that we have here in the Ninth Circuit. And that's why it's important for the judge to step back after and give the jury the room, like you said, Judge Clifton. I understand that she did. But then to fix a wrong. And that's what happened here. I would like to address one other point. I only have 40 seconds, 39 seconds left, because I do think it's important to address the access issue on this appeal. And, Judge Clifton, you're the author of the Loomis decision, which is obviously a seminal case on this issue. And I think ultimately what is important is a reaffirmance of the Ninth Circuit standard, which is that trivial showing is not enough. There must be considerable affirmative proof of widespread dissemination. If that's the test you're going to rely on. And that's all appellants had here. They had no direct access. They had no chain of access. All they had was a widespread dissemination theory and nothing in the brick and mortar world. Nothing other than some critical acclaim, which Judge Clifton, you analyzed in the Loomis case, which fell even far short of that. What was left were certain views on the Internet, on MySpace and YouTube over a five-year period, which rounded to around a six million number. But we put it in context with respect to the experts. And they were essentially minuscule. Mr. Kahn says that these views amounted to multi-platinum standard under the RIAA standards. That's not true. If you really look at that, it's about 40,000. I think time is up. But let me ask my colleagues whether either has additional questions for Ms. LaPera. All right. Thank you very much. So now we're going to hear from Vincent. Is it Chiffin? Is that how you say it? You're on mute, Vince. Right. I'm unfortunately clicking on the picture. Very briefly, I appreciate the opportunity. In response to your comment, Judge Watford, one of the problems is even a thin copyright has, and if we say a thin copyright, which at best this is, has some protection. It's a small monopoly. It protects against virtual identity. But when you take the seven note descending ostinato, you know, even a thin copyright given to this three, two, one progression with just the only thing, we're repeating a few notes. Now the question is from a musician. If that has a thin copyright, does that also protect against something that has, you know, starts with three, pitch three repeated three times, but the second is only one. You strike the pitch two, but, you know, and then you do, I mean, how far? In this terribly narrow situation of composition, a thin copyright, I think, you know, earlier cases were dealing with a different, you know, dealing with a jellyfish statue. I mean, that's a thing. This is a teeny piece of music. And so when, and I don't know if this case is the case to really even get into that because I think it is so obvious that even with a thin copyright protection, you know, ostinato number two doesn't even come close. But that's my observation about, you know, it's a thin copyright sometimes. Yeah, no, I appreciate that. But it's a thin copyright as to the full combination. It's all five or six or eight or nine of these elements that they're saying were blended together in this way. And I guess what I'm trying to figure out is what's the harm in saying, fine, get your little mini monopoly over that unique combination. But if anyone wants to come along and, you know, borrow from that, be inspired by that, and come up with their own variation on that, as long as it's not virtually identical, you're fine. Yeah. No, I understand. Like I said, in this case, I don't think it matters. It was an observation. The only other observation, which is probably obvious from the record, is that my client did not testify as a musicologist. She testified as a pop star who told, you know, answered a question saying she would choose to start her Super Bowl performance of this song, of Dark Horse, start with the chorus that was also testified to be the hook, you know, and the chorus and the hook has an awful lot of music and performance in it, other than a sonata that runs at the bottom. So whatever. But I want to focus on that because I'll be candid. It's that hook or chorus, as you're now describing it, that wound up being the earworm that I couldn't get out of my head for several days after spending a lot of time listening to both of the renditions here. And so it suggests that it's important. And I think that's really all the plaintiff is trying to take from the defendant's testimony. Yeah, this is the focal point of the song. Calling it the hook kind of suggests that. But again, one, the ostinato is not the hook. The hook is the total chorus, OK? And two, that it's attractive to popular listeners of popular music doesn't make it copyrightable. There are numerous cases that say, you know, there's limited ability, you know, and there's few things that appeal to the popular music. So you can't equate that something has a portion of it has a copyright because the public likes it. I mean, that's not the standard. And as Ms. LePere has laid out clearly, that's not the standard of the Ninth Circuit. And it is very important for judges to do what Judge Snyder did, which to go through in detail and apply extrinsic tests and factor out what isn't protectable. May I just add something really quickly, because I think it's very critical to Judge Clifton's question. Ostinato two is not underlying the chorus. That is incorrect. She testified that the chorus is the most important point. It is not under the chorus. It's in the verses. It was started. Her Super Bowl performance started with the end of the verse, which is where Ostinato two ends, and went into the chorus. So the hook does not have what's at issue. I just want to make that clear. I misspoke. With that fine addition, your time is up. Thank you. We have greatly enjoyed it. And thank you both for your argument. Do my colleagues have any additional questions for either of these folks? Very well, Mr. Kahn, you have a few minutes left, and I'll bet you disagree with some of what has been said. We need to turn your mute off there. Sorry about that. At least I'm not a cat video. We've talked some about a theme copyright, which, for reasons we've explained, we don't believe applies. But in addition to all the other elements, where there's plenty of testimony, sparse texture, even beats, the other notes, the melody is unique. Yes, there are six notes that can be found at the end of a children's song, a Christmas song from the 19th century, and six notes that can be found at the beginning of a song from the 1930s. None of them repeat. This melody, which nothing has been shown to precede it, this melody repeats to 45% of dark chords. And while some of the other elements that Dr. Decker testified to that he saw as being original as applied here, maybe yes, maybe no, I'm not a musicologist, but as far as the melody, Dr. Ferrara found no prior repeating melody that played throughout a song. And Dr. Decker was aware of none. And we've seen none. And I would submit, we can break everything down to three Cs, two Bs, one A, whatever. You can do that with Beethoven's Fifth. You can do it with all those other songs out there that each one of us knows. Judge Clifton, you talk about an earworm. I'm sure you've had the same experience I have, which is the song starts to play, and you're two bars into it, you know exactly what the song is. How do you know what the song is? Because it's distinctive. There's something original about it. And that's what happened here. And while opposing counsel can describe what happens at the 18th second point as a chorus or this or that, at that point in the performance, all along with nothing else going on, is you hear this melody, which then repeats throughout the song. So that's basically all I have to say. Then I'll go ahead and take a couple of seconds to say, I mean, my ear was not attuned to the musical performances that I've been listening to for this case. I can deal with a classic a lot. I can deal with the 60s, but this isn't my genre. I get that. So it didn't surprise me. But it did take a little while to figure out exactly what the purported similarities were. I mean, after the first couple listens, I really had to focus to try to figure out, okay, what little short segment matches in the same way? And then after I did it after a while, I could hear it repeating and so forth. But it took enough work that I began to wonder, well, how exactly does that become something protectable? If it's not so virtually identical or if it's not so distinctive that I recognize it in the first few notes, why does the Copyright Act protect it? Why does this serve as a monopoly so that future composers can't try to use that same block, as long as they don't use it in just the same way? And they didn't seem to be used in the same way here. So what is it that should give protection to that short, maybe not quite all that distinctive phrase? Well, our experts said it was distinctive. He's the musicologist. It appeared to be distinctive to Katy Perry. And there's the other combination of the other elements that the two musicologists disagreed over that added to it and what convinced Dr. Decker that this was protectable and was beyond a thin copyright. That's about all I can say. Very well. Other questions that either of my colleagues have for Mr. Kahn? Very well. We thank all the counsel on this case. It's very, very helpful. You're obviously all experts in the area. We appreciate it. The case disargued is submitted and the court stands adjourned for the day. Thank you, Your Honor. Thank you. Everyone be well.
judges: CLIFTON, SMITH, WATFORD